**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert W. AKERS and John Doe Equipment Operator, Defendants-Appellants.**

**No. 85–1750.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1985.

Decided March 26, 1986.

Edward J. Shawaker, Atty., U.S. Dept. of Justice, Washington, D.C., James L. Bur-

ling, Sacramento, Cal., for plaintiff-appellee.

Lanny T. Winberry, Giattina & Winberry, Sacramento, Cal., for defendants-appellants.

Before WRIGHT, KENNEDY and BEEZER, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This litigation is the unfortunate result of a standoff between a California farmer who seeks to farm his wetlands more productively and the Army Corps of Engineers which regulates wetland use under the Clean Water Act ("Act"), 33 U.S.C. §§ 1251–1376 (1982 & Supp. I 1984). The Corps succeeded in enjoining dredge and fill activities for which a permit had not been sought. We are asked to construe the Act's exemptions and review the scope of the preliminary injunction awarded to the government. We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we affirm.

BACKGROUND

In January 1984, Robert W. Akers purchased approximately 9,600 acres in Lassen and Modoc counties, near Bieber, California. The property includes 2,889 acres of wetlands, known locally as the "Big Swamp." Ash Creek, a tributary to the Pit River, flows across the property. The Pit River, Ash Creek, and their channels and adjacent wetlands are subject to the Corps's jurisdiction under Section 404 of the Act, 33 U.S.C. § 1344 (1982).[1]

Big Swamp is an important wildlife habitat. It provides seasonal refuge for numerous species, including the bald eagle and peregrine falcon, both endangered species, the greater sandhill crane, listed as rare by California authorities, and the cackling Canada goose, whose numbers have decreased sharply in recent years. Less threatened species, including Canada geese, snow geese, and mallard, pintail, shoveler and cinnamon teal ducks, also inhabit the area.

The following chronology summarizes Akers' battle with the Corps over Big Swamp farming:

| | |
|---|---|
| March 1984 | Corps learned of Akers' "farming plan" to carry out extensive grading, leveling, drainage and water diversion to convert the wetlands to farm land suitable for growing upland crops. After a preliminary investigation, the Corps determined that its jurisdiction extended to roughly one-third of Akers' property and that a Section 404 permit would be required. |
| May 4 | Akers sued the government for declaratory and injunctive relief under the Act alleging that the Corps's assertion of regulatory jurisdiction was improper and illegal. TRO issued enjoining Corps from asserting regulatory jurisdiction over Akers until hearing on motion for preliminary injunction. The order also enjoined Akers from construction activities. |
| May 15 | Akers' motion for preliminary injunction was denied. |
| July 16 | Akers voluntarily dismissed his lawsuit. He began the first of three phases of earthmoving activity. Along the western border of his property, he built a dike 3,500 feet long, two to three feet high and six feet wide. He first told the Corps he was ditch cleaning, but later said he was repairing a pre-existing temporary irrigation structure. |
| Late July or early August | Corps determined that Akers needed a permit and issued a cease and desist order. By that time, the project was finished. |

---

1. Akers concedes, for purposes of this case, that portions of his property are "wetlands" under the Corps's expansive definition, 33 C.F.R. § 323.2(c) (1985). His principal contention, however, is that his activities are exempt.

**August 13** — Corps withdrew cease and desist order based on assurances that the dike would be used only for the purposes that the previous structure had served (although new dike was longer and in a different location).

**August 30** — Akers was informed by the Corps's District Engineer ("DE") that 2889 acres of his farm contained wetlands within the Corps's jurisdiction.

**September 2** — Corps learned of work in central portion of wetlands.

**September 13** — Corps's aerial survey revealed two-mile long dike had been constructed east-to-west through the wetlands. On the west end, the dike connected perpendicularly to the other recently-constructed dike on the western property line. A grader and tractor (pulling discs) were seen along the dike. Some wetlands south of the dike had been leveled. Corps issued a cease and desist order.

**September 17** — Fly-over showed that sometime after September 13, the dike had been lengthened from two to three miles.

**September 26** — Fly-over revealed large north-south ditch on the eastern edge of the property, possibly 50 feet wide. While the ditch was mostly on non-wetlands, it filled two natural channels of Ash Creek. Corps also observed roads being constructed in the northwest section of the property. These roads blocked several overflow channels of the Pit River.

**October 3** — The U.S. sued Akers seeking declaratory and injunctive relief, civil penalties and restoration.

**October 5** — District court granted TRO forbidding Akers from depositing dredged or fill material in waters on his property, except in certain channels with Corps's permission.

**October 24** — Court orally granted government's motion for preliminary injunction.

**October 31** — Written TRO entered.

**January 14, 1985** — Oral argument on motions for reconsideration and intervention of the California Cattlemen's Association, Agricultural Council of California, National Cattlemen's Association, and California Farm Bureau ("Cattlemen") on behalf of Akers and the National Audubon Society and National Wildlife Federation ("Audubon") on behalf of the government.

**January 15** — Court issued written findings of fact, conclusions of law and order reconfirming the earlier oral preliminary injunction. The order prohibited Akers from depositing dredged or fill material into the waters, channels or wetlands previously delineated by the Corps unless he: (1) obtains a permit from the Corps, *or* (2) submits a proposal for dredge or fill activities, which he asserts are not within the Corps's jurisdiction, *and* (a) is informed in writing by the DE that a permit is not necessary; *or* (b) is *not* informed in writing by the DE whether a permit is necessary within 15 days of receipt of his proposal. The court also ordered that Akers must comply in good faith with Corps cease and desist orders regarding dredge and fill activities on his property.

**January 31** — Court granted permissive intervention of the Cattlemen and Audubon groups.

This appeal followed. Akers has not applied for a § 404 permit from the Corps.

STANDARD OF REVIEW

A preliminary injunction will be reversed "only if the lower court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Flynt Distributing Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.

1984). The injunction will be upheld if the court correctly found that the government demonstrated either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of the hardships tips sharply in its favor. *Goldie's Bookstore, Inc. v. Superior Court,* 739 F.2d 466, 470 (9th Cir.1984). These are not separate tests, but rather, "extremes of a single continuum." *Benda v. Grand Lodge of the International Association of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

STATUTORY FRAMEWORK

The Act aims "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1982). "This purpose is to be achieved by compliance with the Act, including compliance with the permit requirements." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 315, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982) (footnote omitted).

The Act prohibits the discharge of dredged or fill materials into "navigable waters"—defined as "waters of the United States"—unless authorized by a permit issued by the Corps pursuant to § 404. *See generally* 33 U.S.C. §§ 1311, 1344 (1982). "Waters of the United States" is broken down into seven categories, including wetlands. *See* 33 C.F.R. § 323.2(a) (1985).

Recently, a unanimous Supreme Court upheld the Corps's wetlands definition[2] in *United States v. Riverside Bayview Homes, Inc.,* — U.S. —, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The lands in question are wetlands under the Corps's definition; hence, the Corps had authority, absent an applicable exception, to require Ak-

ers to obtain a permit before engaging in dredge and fill activities.

Limited exemptions from the permit requirement are found in Section 1344(f), which provides in pertinent part:

**(f) Non-prohibited discharge of dredged or fill material** (1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

\*     \*     \*     \*     \*     \*

(C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

\*     \*     \*     \*     \*     \*

(E) for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized;

\*     \*     \*     \*     \*     \*

is not prohibited by or otherwise subject to regulation under this section. . . .

---

**2.** Under the Corps's definition, "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2(c) (1985). While the Court construed the 1977 definition, it noted that the 1982 definition, quoted above, is "substantively identical." *United States v. Riverside Bayview Homes, Inc.,* — U.S. —, 106 S.Ct. 455, 458, 88 L.Ed.2d 419 (1985).

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

Akers' activities must be analyzed in light of the Act's purposes and the intended scope of its exemptions. The Fifth and Seventh Circuits have construed the § 1344(f)(1) exemptions narrowly. *See United States v. Huebner,* 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 925 n. 44 (5th Cir. 1983).

This construction is consistent with the legislative history. Senator Muskie described the exemptions during Senate debate:

New subsection 404(f) provides that Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively. While it is understood that some of these activities may necessarily result in incidental filling and minor harm to aquatic resources, the exemptions do not apply to discharges that convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body.

3 *Legislative History of the Clean Water Act of 1977* ("Leg.Hist.") at 474 (Senate Debate, Dec. 15, 1977). As the legislation's primary sponsor, his remarks are entitled to substantial weight. *See Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976); *Environmental Defense Fund, Inc. v. Costle,* 636 F.2d 1229, 1243 & n. 48 (D.C.Cir.1980).

To be exempt from the permit requirements, one must demonstrate that proposed activities both *satisfy* the requirements of § (f)(1) and *avoid* the exception to the exemptions (referred to as the "recapture" provision) of § (f)(2). *See Avoyelles,* 715 F.2d at 926 ((f)(2) takes away some of the exemptions provided in (f)(1)). Akers must establish that his activities are exempt.

ANALYSIS

(1) *The "Normal Farming" Exemption: § 1344(f)(1)(A)*

■ The court rejected this exemption because the wetlands portion of Akers' farm "has never been subjected to any established upland farming operation," relying on 33 C.F.R. § 323.4(a)(1)(ii) (1985). That regulation provides in pertinent part:

To fall under this exemption, the activities ... must be part of an established (i.e., on-going) farming, silviculture, or ranching operation. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation. Activities which bring an area into farming, silviculture, or ranching use are not part of an established operation. An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations....

Akers bases his entitlement to the exemption on the fact that all of his land, including the wetlands, has been farmed since 1897. He contends that discing and seeding have been part of the farming operation traditionally undertaken on his land.

He ignores the consequences of the new projects, however. We cannot view Akers' plowing, discing and seeding in isolation. The record amply supports the court's finding that upland crop production has not occurred on these wetlands on a regular basis. Upland farming represents a new operation in the wetlands.

Moreover, Akers argued below that unless he were allowed to complete the work he had started, the effect of which is to drain the wetlands, he would be unable to

engage in the farming activities he had planned. By his own admission, his activities require substantial hydrological alteration to Big Swamp, and run afoul of the regulations.

At oral argument, counsel for the government advocated a position of complete authority to prohibit *all* changes in wetland use which involve discharges of pollutants without prior Corps approval. Discing of soil is a point source of pollutants, according to the Corps.

Responding to our inquiries, government counsel asserted that the Corps would require Akers, and other farmers like him, to obtain a § 404 permit before switching from one *type* of wetland crop to another, if the new crop had not been farmed previously. For example, if Akers desired to plant wild rice, a wetland crop, the Corps would require a permit since rice has not been farmed in Big Swamp in the past.

Although we affirm the injunction as a reasonable response to the peculiar facts before us, we do not endorse the government's authoritative position. We do not believe that Congress intended to place the burden of Corps permit regulation on farmers who desire merely to change from one wetland crop to another.

(2) *The "Irrigation" Exemption: § 1344(f)(1)(C)*

The court rejected Akers' attempt to characterize the three-mile long dike bisecting the wetlands as an exempt irrigation facility. He argues that non-exempt dikes hold water on their lowland sides while exempt structures, such as his dike, hold water on their upland sides.

█ It is irrelevant how he characterizes the dike. Provided the structure has the effect of keeping water from the southern wetlands, its construction requires a permit. *See Huebner,* 752 F.2d at 1242. The regulation defining "minor drainage," as that term is used in the "normal farming" exemption, supports the government's position:

> Minor drainage in waters of the U.S. is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adapted to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming). In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

33 C.F.R. § 323.4(a)(1)(iii)(C)(2) (1985).

Akers also argues that the dike is physically connected and functionally related to an irrigation ditch and, therefore, is exempt under 33 C.F.R. § 323.4(a)(3) (1985):

> Discharges associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

The court concluded that the dike was not one of the types of structures specified in the regulation and was not subsidiary to an irrigation ditch. Akers has not demonstrated that these factual findings are clearly erroneous.[3]

(3) *The State Water Rights Proviso: 33 U.S.C. § 1251(g)*

Akers asserts that the court construed 33 U.S.C. § 1251(g) (1982) (also known as

---

3. Akers also contends that the court ignored the fact that flood flows caused a breach in the dike and that he intended to place culverts in it. The court rejected these developments as irrelevant. It properly focused on the probable consequences of what had been completed to the time of the hearing on the motion for preliminary injunction.

the "Wallop Amendment") too narrowly by rendering his state-allocated water rights "virtually meaningless." He urges us to apply the irrigation exemption "so as to not impair or abrogate state allocated water rights."

Section 1251(g) provides:

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

Akers attacks the "ambiguous" references to legislative history relied on by the district court when it refused to apply § 1251(g). Senator Wallop, who sponsored the amendment, described its purpose during Senate debate:

The requirements of section 402 and 404 permits may incidentally affect individual water rights.... It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations. This amendment is an attempt to recognize the historic allocation rights contained in State constitutions. It is designed to protect historic rights from mischievous abrogation by those who would use an act, designed solely to protect water quality and wetlands, for other purposes. It does not interfere with the legitimate purposes for which the act was designed. 3 Leg.Hist. 532 (Senate Debate, Dec. 15, 1977).

■ As intervenor Audubon points out, any incidental effect on Akers' rights to

state-allocated water from the Pit River is justified because protection of Big Swamp is the type of legitimate purpose for which the Act was intended.

In *Riverside Irrigation District v. Andrews,* 758 F.2d 508, 513 (10th Cir.1985), the Tenth Circuit construed the Wallop Amendment as an indication

'that Congress did not want to interfere any more than necessary with state water management.' *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 178 (D.C.Cir.1982). A fair reading of the statute as a whole makes clear that, where both the state's interest in allocating water and the federal government's interest in protecting the environment are implicated, Congress intended an accommodation. Such accommodations are best reached in the individual permit process.

Akers staunchly has resisted the permit process. The injunction properly compels him to participate in it.

#### (4) *The "Roadbuilding" Exemption: § 1344(f)(1)(E)*

■ Akers disagrees with the court's findings that he constructed a road across overflow channels of the Pit River and failed to comply with best management practices. Rather than challenging these findings as clearly erroneous, he asserts that the injunction is overbroad. He contends that instead of enjoining all roadbuilding, the appropriate remedy "was simply to notify him as to what actions were necessary to bring the road into conformity with best management practices, and require compliance therewith in future activities." We disagree.

The roadbuilding regulations set forth in 33 C.F.R. § 323.4(a)(6) (1985) describe with sufficient clarity what Akers had to do to comply with § 1344(f)(1)(E). As explained in the overbreadth section below, the court properly considered Akers' misunderstanding and disregard of the Act in fashioning appropriate relief.

**(5)** *The "Recapture" Provision: § 1344(f)(2)*

Judge Ramirez concluded that Akers was unlikely to avoid the recapture provision even if he established an applicable exemption. Over Akers' argument that upland crops *could* have been grown in the wetlands, the court wrote:

> The proper inquiry is not what could have been done but what *was* done in the past and its relationship to what Mr. Akers is attempting to do now. Furthermore, Mr. Aker's [sic] argument ignores the question of whether there will be a change in Big Swamp from wetlands (i.e., waters of the United States) to dry land (no longer waters of the United States). Whether or not there have been isolated incidents of attempted farming of upland crops in the swamp during dryer periods, there is little doubt that the area is still a wetland within the meaning of the Clean Water Act. Mr. Akers' activities taken as a whole appear to this Court to be incidental to an effort to convert the area so that it may be farmed in a way which is inconsistent with its remaining a wetland.

*United States v. Akers,* No. CIV–84–1276 RAR, Conclusion of Law XIV (E.D.Cal. Jan. 15, 1985). The court did not abuse its discretion in reaching this conclusion.

Additionally, Akers asserts that "use" denotes a major type of use, e.g., farming, silviculture or ranching. Because the land has been used for farming since 1897, he claims there is no major change of use within the meaning of § (f)(2).

He attempts to distinguish *Huebner* and *Avoyelles,* where the recapture provision was applied. He asserts that those cases involved major changes *to* agricultural use, whereas his actions represent "a change within the farming use." However, he cannot escape the impact of these opinions, which classify as non-exempt those activities which change a wetland's hydrological

regime. *See Huebner,* 752 F.2d at 1242; *Avoyelles,* 715 F.2d at 926.[4]

While the exemptions and regulations do not distinguish major and minor changes, the intent of Congress in enacting the Act was to prevent conversion of wetlands to dry lands. For example, Representative Harsha, a member of the conference committee, stated during House debate:

> To assure that the extent of these exempted activities will not be misconstrued, ... (f)(2) provide[s] common sense limitations to protect the chemical, biological, and physical integrity of the Nation's waters. While it is understood that some of these activities may necessarily result in incidental filling and insignificant harm to aquatic resources, the exemptions do not apply to discharges that convert more extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body.

3 Leg.Hist. 420 (House Debate, Dec. 15, 1977).

It is thus the substantiality of the impact on the wetland that must be considered in evaluating the reach of § (f)(2). *Cf. Huebner,* 752 F.2d at 1242 (district court properly considered results of dredging as it affected surrounding wetlands). The court's findings on wetland conversion, not clearly erroneous, establish:

> It appears likely that if this work is allowed to remain in place, or allowed to be expanded, an extensive area of the Big Swamp wetlands will be converted to non-wetland, thereby significantly reducing the reach of Big Swamp. In addition, the flow and circulation in Ash Creek and the overflow channels of the Pit River may be impaired. Furthermore, many highly significant aquatic functions now performed by the Big Swamp wetlands area will be lost or impaired.

*United States v. Akers,* Finding of Fact X.

■ Giving the recapture provision the appropriate common sense reading, it ap-

---

**4.** *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 646–47 (5th Cir.1983), relied on by appellant, is distinguishable because no change in

wetland hydrological regime was proposed. "The wetlands involved here will not be converted as in *Avoyelles,*" wrote that court. *Id.* at 647.

pears that Akers' activities are not exempt from permit requirements due to the likely drying effect. As discussed earlier, this is not to say that he could not change from one wetland crop to another without running afoul of the recapture provision.

### (6) *Is the Injunction Overbroad?*

Finally, he argues that the injunction is overbroad because it requires Corps approval for all his dredge and fill activities, including those clearly exempt. The government responds by stating that the conditions are necessary to preserve the *status quo*. The government stresses the non-onerous nature of this injunction, considering the requirement that the Corps respond to a permit application within 15 days.

■ The district court has considerable discretion to fashion appropriate injunctive relief, particularly where the public interest is involved. *See Virginian Railway Co. v. System Federation No. 40, etc.*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937); *State of California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1324 (9th Cir.) (district court has greater power to fashion equitable relief in defense of the public interest than it has when only private interests are involved), *amended*, 775 F.2d 998 (9th Cir.1985). The Supreme Court has recognized that the Act gives the district court discretion "to order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. at 320, 102 S.Ct. at 1807.

In enjoining the filling of wetlands without a permit, courts have noted that the public interest requires strict enforcement of the Act to effectuate its purpose of protecting sensitive aquatic environments. *See United States v. Ciampitti*, 583 F.Supp. 483, 499 (D.N.J.1984); *United States v. Lofgren*, 13 Envtl.L.Rep. (Envtl. L.Inst.) 20,164 at 20,166 (E.D.Mich.1982) (presumption in favor of preliminary in-

junction in light of Act's objectives which include maintaining Corps's regulatory scheme) (discussed in W. Want, *Federal Wetlands Law: The Cases and the Problems*, 8 Harv.Envtl.L.Rev. 1, 52 (1984)).

■ Judge Ramirez did not abuse his discretion in issuing this injunction. He considered extensive testimony regarding past and present uses of Big Swamp, ecological disruption caused by the ongoing and proposed activities, Akers' avoidance of the Corps's permit process, harm incurred by Akers, and the legislative history of the exemptions. The findings and conclusions supporting the injunction are comprehensive and reflect a well-balanced consideration of the competing interests.

## CONCLUSION

Akers has failed to demonstrate that the injunction was based on erroneous legal standards or clearly erroneous findings of fact. Nor does he demonstrate that Judge Ramirez abused his discretion.

We are mindful of the plight of today's farmers. So was Congress when it enacted the wetlands legislation at issue here. It did not intend to prohibit all changes of wetlands, however minor, without prior Corps approval.

The changes proposed by Akers are far from minor, however. They contemplate a major conversion from wetlands to dry lands, thereby necessitating a Corps permit. Judicial review of Corps permit approval or denial provides the necessary check against arbitrary government action. We assume that the Corps will not act arbitrarily when it rules on Akers' future permit applications.

This litigation resulted from an inability to work cooperatively. Both parties bear some fault for the breakdown in communications. Reasonableness and cooperation are indicated. The preliminary injunction is AFFIRMED.[5]

---

**5.** Intervenor Audubon's request for attorney's fees on appeal is denied. Counsel has not identified any basis for such an award, and we find

none. The motion for intervention pursuant to 33 U.S.C. § 1365, where fees are provided, was

denied. Instead, Judge Ramirez granted per-        missive intervention under Fed.R.Civ.P. 24(b).