**SWINOMISH INDIAN TRIBAL COMMUNITY, Plaintiff,**

v.

**SKAGIT COUNTY DIKE DISTRICT NO. 22, et al., Defendants.**

**Case No. C07–1348RAJ.**

United States District Court, W.D. Washington, at Seattle.

Sept. 5, 2008.

Jan Erik Hasselman, Earthjustice Legal Defense Fund, Seattle, WA, for Plaintiff.

Gary T. Jones, Jones & Smith, Mt. Vernon, WA, Karen Jean Budd–Falen, Budd–Falen Law Office LLC, Cheyenne, WY, for Defendants.

## ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

This matter comes before the court on cross-motions for partial summary judgment (Dkt. ## 22, 25). The court has considered the parties' briefing and supporting evidence, and has heard from the parties at oral argument. For the reasons explained below, the court GRANTS Plaintiff's motion and DENIES Defendants' motion.

## II. BACKGROUND

The Skagit River is the largest river in Puget Sound, and is the only Puget Sound river inhabited by all six Pacific salmon species. Pltf.'s Mot. (Dkt. # 21), Ex. 1 at 25. The Skagit River delta is also a productive farming area, generating hundreds of millions of dollars in economic activity. *Id.*, Ex. 1 at 27.

Plaintiff Swinomish Indian Tribal Community ("Swinomish") has brought a citizen suit against Defendants Skagit County Dike District No. 22 ("the District"), the District's board of commissioners, and five individual commissioners, alleging that the Defendants [1] violated the Clean Water Act ("CWA") and the Endangered Species Act ("ESA") due to the construction of three tidegates in the Skagit River delta. A tidegate is a one-way flap over a culvert lodged in a stream channel, intended to allow farmland drainage while obstructing the flow of saltwater. The tidegate remains closed as the incoming tide exerts

---

1. The Defendants are collectively referred to as "the District" hereinafter.

pressure on it, but as the tide ebbs, the pressure eases and water draining from fields opens the tidegate and empties into the bay. The District is responsible for the construction, maintenance, and operation of the system of numerous dikes and tidegates on the area of land known as Fir Island, which is located between the north and south forks of the Skagit River. Most tidegates in the District, including the three tidegates at issue in this case, do not allow fish passage.

In July 2002, the District sought a Hydraulic Project Approval ("HPA") from the Washington Department of Fish and Wildlife ("WDFW") for the complete replacement of the western culvert, dike, and tidegate at the mouth of Dry Slough.[2] Pltf.'s Mot., Ex. 4. In September 2002, WDFW issued an HPA for the immediate but temporary replacement of the existing culvert and tidegate at Dry Slough, requiring the District to replace the temporary structure with a "self-regulating"[3] tidegate within a year. Id., Ex. 5. The District and Swinomish appealed the HPA, and state law was subsequently amended to prohibit requiring self-regulating tidegates. See RCW 77.57.030(3).

During this time, while the District was planning to replace the Dry Slough tidegate, the Army Corps of Engineers ("the Corps") notified the District that any removal or replacement of a tidegate must be authorized by the Corps under § 404 of the CWA and § 10 of the Rivers and Harbors Act. Pltf.'s Mot., Ex. 6. The Corps also informed the District that the Corps would need to consult with the National Marine Fisheries Service ("NMFS") before it could authorize a new tidegate, due to the likely impact on chinook salmon, a "threatened" species under the ESA. Id., Ex. 6.

On September 6, 2002, The District completed its tidegate replacement—which involved digging out 90 feet of four-foot pipe from deep inside the dike, replacing it with new pipe and a new tidegate, and replacing the fill—without seeking a permit from the Corps or any other agency. Id., Ex. 7. In a letter dated September 23, 2002, the Corps notified the District that it had violated federal law. Id., Ex. 8. The District disputed the Corps' jurisdiction to require a permit, and the Corps communicated its disagreement with that position. See id., Ex. 10 (a letter from the Corps to the District requesting an explanation of why it believed the Corps lacked jurisdiction).

A series of meetings between the District and other dike districts, the Corps, and the U.S. Environmental Protection Agency ("EPA") resulted in a Corps/EPA recommendation that the federal agencies take joint enforcement action "as a means of bringing these entities into compliance and making the Diking Districts well aware of permitting requirements and enforcement consequences before additional violations occur." Id., Ex. 11. The Corps directed the District either to remove the tidegate or to apply for an "after the fact" CWA permit. Id., Ex. 9. The District initially refused to apply for an "after the fact" permit because it maintained that the Corps lacked jurisdiction over the replacement action. See id., Ex. 3. The District later applied for an "after the fact" permit, and as part of its application, hired an environmental consulting firm to prepare an ESA "biological assessment." See id., Exs. 2 (the biological assessment) and 17

---

**2.** Although there is more than one tidegate in Dry Slough, but only the western tidegate at the mouth of Dry Slough is at issue in this case, so the order hereinafter refers to that tidegate as the "Dry Slough tidegate."

**3.** A "self-regulating" tidegate remains open during some portion of the incoming tide, thereby allowing juvenile salmon to pass through the gate.

(a letter from the District's counsel referring to the biological assessment that was included in an "after the fact" application). The biological assessment evaluated the impact of the act of replacing the tidegate (not the long-term, indirect impacts of the new tidegate), and concluded that the replacement had limited impact on chinook salmon. *Id.*, Ex. 2.

NMFS disagreed with this assessment, concluding that the District's action "jeopardized" the existence of the chinook and "adversely modified" their critical habitat in violation of the ESA. Wasserman Decl. (Dkt. # 24), Ex. 1 ("NMFS Biological Opinion") at 47–48. As required by the ESA, NMFS proposed a reasonable and prudent alternative ("RPA") that would allow the permitting process to proceed without a violation of the ESA. *See* 50 C.F.R. § 402.02 (requiring that an RPA be technologically and economically feasible, within the agency's authority, and consistent with the purpose of the proposed action). The RPA involved taking additional measures to improve habitat conditions for fish in the Dry Sough, including the installation of a self-regulating tidegate, placement of woody debris in the slough, and the establishment of riparian vegetation. NMFS Biological Opinion at 49–51. The Corps never issued an "after the fact" permit, and the Dry Slough tidegate remains unpermitted.[4]

In March 2006, the District submitted permit applications to the Corps to replace tidegates in two additional areas: one on the Wylie property and one on the Eakins property. Pltf.'s Mot., Ex. 29–30. The applications assert that the tidegates were not providing adequate water control and that farmland was being damaged as a result. *Id.* In April 2006, the

Corps informed the District that additional information regarding the Wylie tidegate was required before permits could be issued. *Id.*, Ex. 31. The District prepared biological assessments of both actions, in accordance with the ESA. *Id.*, Ex. 32–33. In July 2006, the Corps again instructed the District not to commence construction on the Wylie tidegate until the permit was approved, pending the submission of additional information. *Id.*, Ex. 34. In a letter dated August 4, 2006, the District notified the Corps that the District had already passed a motion authorizing work on the Wylie and Eakins tidegates because the District believed it was an emergency. *Id.*, Ex. 35. The Wylie and Eakins tidegates were replaced August 4–10, 2006. *Id.*, Ex. 36.

The District informed the Corps of the replacement actions at the Wylie and Eakins property, noting that it "very reluctantly went forward without clear authority from [the Corps] to have this work done." *Id.*, Ex. 37. The District indicated a willingness to obtain "after the fact" permitting, but noted that it still contended that the Corps lacked CWA jurisdiction over the replacement actions. *Id.* The Corps inspected the Wylie and Eakins sites, and informed the District that it believed the actions were under the Corps' jurisdiction and that the replacement actions were not performed under emergency circumstances. *Id.*, Ex. 38. To date, the Corps has issued no permits regarding the Wylie or Eakins tidegates.

## III. ANALYSIS

### A. Standard of Review on Summary Judgment.

Swinomish moved for partial summary judgment on its CWA claims with regard

---

4. Though it appears that the Corps intended to take enforcement action against the District—*see* Pltf.'s Mot., Ex. 15—the Corps has taken no such action to date. The District has made no contention that Swinomish lacks jurisdiction to bring CWA or ESA claims against the District.

to all three tidegates, and on its ESA claim with regard to the Dry Slough tidegate. The District cross-moved for partial summary judgment against the CWA and ESA claims with regard to the Eakins and Wylie tidegates.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets that initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties agreed at oral argument that there are no disputed facts that would preclude summary judgment, and that the issues presented to the court are questions of law.

**B. The District Violated the CWA by Constructing the Dry Slough, Eakins, and Wylie Tidegates Without Corps Permits.**

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any "pollutant," which includes dredge spoils and fill, into waters of the United States except as authorized by other provisions of the Act. *See* 33 U.S.C. § 1311(a), 1362(6). One such provision is CWA § 404, which requires a permit from the Corps for the discharge of any dredged or fill material into waters of the United States. 33 U.S.C. § 1344; 33 C.F.R. § 323.3(a). If a person discharges fill material into U.S. waters without a § 404 permit or without qualifying for one of the permit exemptions, that person violates the CWA. *United States v. Akers*, 785 F.2d 814, 818 (9th Cir.1986). The ongoing presence of fill materials without a permit represents a continuing violation of the CWA. *See Sasser v. Adm'r E.P.A.*, 990 F.2d 127, 129 (4th Cir.1993); *Center for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F.Supp.2d 789, 798 (C.D.Cal. 2006); *United States v. Cumberland Farms*, 647 F.Supp. 1166 (D.Mass.1986). CWA exemptions must be "analyzed in light of the Act's purposes" and must be construed narrowly. *Akers*, 785 F.2d at 819. It is a defendant's burden to demonstrate that a particular act is exempt from the CWA. *Id.*, 785 F.2d at 814.

The CWA exempts maintenance actions from the permit requirement: no permit is required if dredged or fill material is discharged "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." 33 U.S.C. § 1344(f)(1)(B). Maintenance does not include "any modification that changes the character, scope, or size of the original fill design," and any "[e]mergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption." 33 C.F.R. § 323.4(a)(2). In a different section of the CWA, "currently serviceable" is defined as "[u]seable as is or with some maintenance, but not so degraded as to essentially require reconstruction." 72 Fed.Reg. 11196.

If the CWA requires a permit for a particular action, there are two types of permits available under CWA § 404: individual permits and general permits. Individual permits are issued by the Corps to specific applicants for specific projects.

*See Home Builders Ass'n of Greater Chicago v. United States Army Corps of Engineers,* 335 F.3d 607, 612 (7th Cir.2003). General permits cover activities that "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). General permits have a streamlined permitting process, and include several nationwide permits. *See* 72 Fed.Reg. 11092 (Mar. 12, 2007). For example, Nationwide Permit ("NWP") 3 ("Maintenance") covers:

> The repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure, or fill, or of any currently serviceable structure or fill authorized by 33 C.F.R. § 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized. This NWP authorizes the repair, rehabilitation, or replacement of those structures or fills destroyed or damaged by storms, floods, fire or other discrete events, provided the repair, rehabilitation, or replacement is commenced, or is under contract to commence, within two years of the date of their destruction or damage. In cases of catastrophic events, such as hurricanes or tornadoes, this two-year limit may be waived by the district engineer, provided the permittee can demonstrate funding, contract, or other similar delays.

72 Fed.Reg. at 11181. Those intending to proceed with a project under an NWP must comply with various notification and authorization requirements. *See* 72 Fed. Reg. at 11191–94 (explaining the circumstances where the Corps must be given pre-construction notification).

### 1. The CWA Applies to the District's Actions.

The District does not dispute that it discharged dredged or fill material in U.S. waters in the course of the Dry Slough, Wylie, and Eakins tidegate replacements, and also does not dispute that it did not obtain a permit for those actions. *See* Defs.'s Opp'n (Dkt. # 29) at 14. It claims that the CWA does not apply to its actions because the original tidegates at those locations pre-date the enactment of the CWA, and the replacement actions did not alter the "size, footprint, capacity or characteristics" of the original tidegates. *Id.* at 10. The District interprets the CWA to apply only to those types of substantial changes to a tidegate's pre-CWA footprint.

■ The District has cited no authority to support its interpretation of the CWA. This interpretation is inconsistent with the purpose of the CWA, which is the regulation of the discharge of pollutants in U.S. waters. *See* 33 U.S.C. § 1251(a). The CWA's application is not triggered by modifying a tidegate's pre-CWA footprint. A CWA violation occurs where (1) the United States has jurisdiction over the waters at issue, (2) the defendants discharged or placed fill or dredged material in those waters, and (3) the defendants did so without a Corps permit. *United States v. Zanger,* 767 F.Supp. 1030, 1033 (N.D.Cal.1991). Thus, it is irrelevant for purposes of the CWA whether the District modified a tidegate's pre-CWA footprint. Because the District admits that it discharged fill or dredged materials into federal waters, the only relevant issue to be decided by this court is whether the District was required

under the CWA to obtain a Corps permit for its actions.

## 2. None of the Tidegates was Currently Serviceable at the Time of the District's Actions, so Those Actions Were Not Covered by the CWA's Maintenance Exemption.

Though the District contends that the CWA does not apply in this case, it argues that if the CWA does apply, then its actions were exempt under the CWA's maintenance exemption, 33 U.S.C. § 1344(f)(1)(B). Swinomish contends that the maintenance exemption does not apply here because the District's reconstructed the tidegates, and "maintenance" does not include "reconstruction" for purposes of 33 U.S.C. § 1344(f)(1)(B).

■ The court agrees with Swinomish. The District's project documentation demonstrates that the District's actions were beyond mere maintenance because the tidegates had to be replaced. *See* Defs.' Mot. (Dkt. # 25), Exs. 3, 7–8 (describing the process of removing and replacing the tidegates). If a tidegate has deteriorated to the point it must be replaced, it could not be considered "currently serviceable" for purposes of the maintenance exemption. Under the plain meaning of the phrase, "currently serviceable" must mean that a structure is performing its function to some degree. Because the maintenance exemption distinguishes between maintenance of currently serviceable structures and the emergency reconstruction of parts of structures, the court concludes that a currently serviceable structure is one that does not require reconstruction. This conclusion is supported by the CWA's defini-

tion of "currently serviceable" for purposes of nationwide permits: "[u]seable as is or with some maintenance, but not so degraded as to require reconstruction."[5] For these reasons, the court concludes that the District's actions were not exempt as maintenance.

## 3. The District's Actions Were Not Exempt as Emergency Reconstruction.

Though the District does not argue that its actions were exempt under the "emergency reconstruction" portion of the maintenance exemption, the court agrees with Swinomish that the District's actions cannot be considered "emergency reconstruction." The District was aware of the Dry Slough tidegate's failure for seven months it was eventually replaced, and the Wylie and Eakins tidegates were impaired for at least two years before they were replaced. *See* Pltf.'s Mot., Exs. 45–47 (District meeting minutes reflecting discussion of the Dry Slough tidegate leak seven months before it was replaced), and 37 (a letter from District counsel describing the Wylie and Eakins' tidegate failures for years before the replacement).

■ At oral argument, the District explained that it waited for better conditions to replace the Dry Slough tidegate. The fact that waiting months was an option supports Swinomish's argument that the replacement was not an emergency. Therefore, because the District admits that it was aware that the tidegates were failing for months or years before it decided to replace them, the court concludes that the District's actions were not exempt as "emergency reconstruction."

---

5. The District has presented evidence of the Corps' definition of "maintenance" as it relates to drainage ditches. *See* Defs.' Memo., Ex. 1 at 4 (defining "maintenance" as "repair to an existing structure or feature to keep the ditch in its existing state or proper condition, or to preserve it from failure or decline"). This document does not establish a general definition of "maintenance," but applies only to ditch maintenance. *See id.*

#### 4. The District's Actions Were Not Covered by NWP 3.

■ Though the District does not argue that its actions were covered as maintenance under NWP 3, Swinomish contends that NWP 3 could not apply because the actions taken were replacement actions, not maintenance actions, and NWP 3 only covers replacement of a previously authorized structure "damaged or destroyed" by "discrete events" such as fires, floods, or storms. *See* 72 Fed.Reg. at 11181. There is no contention that any of the tidegates at issue were damaged by a discrete event, and the court agrees (as discussed earlier) that the District's actions were beyond mere maintenance. Furthermore, even if NWP 3 did cover the District's activities here, the District did not comply with any of the notification or authorization requirements of NWP 3. *See* Pltf.'s Mot., Exs. 8 (letter from the Corps to District counsel stating that the Corps was not notified before the District replaced the Dry Slough tidegate), 37 (letter from District counsel to the Corps explaining that the District replaced with Wylie and Eakins tidegates without Corps authorization), 38 (letter from the Corps to the District, explaining that the District did not comply with the NWP authorization requirements).

Therefore, because the court agrees with Swinomish that NWP 3 does not cover the District's actions—and, even if it did, the District did not comply with the NWP conditions—the court concludes that the District's actions were not authorized under NWP 3.

Because it is undisputed that the District replaced the Dry Slough, Wylie, and Eakins tidegates without Corps permits, and because the court has rejected the District's arguments regarding CWA permit exemptions, Swinomish is entitled to judgment as a matter of law on its CWA claims.

#### C. The District Violated the ESA Because the Dry Slough Tidegate Results in Harm to "Threatened" Chinook Salmon.

Section 9 of the ESA prohibits activities that "take" any endangered species within the United States or its territorial sea. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). NMFS has defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102. NMFS has also explained that habitat modification that significantly impairs essential behaviors constitutes injury and a prohibited "take." 64 Fed.Reg. 60727, 60728 (Nov. 8, 1999). Regulations also define "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. Regulations also specify that structures that alter streamflow to cause harm to habitat can constitute a "take." *See* 64 Fed.Reg. at 60728 ("Maintaining an existing barrier that prevents or impedes access to habitat may cause take of listed species, if adequate comparable habitat is not otherwise available to the listed populations.").

The ESA's "take" prohibition applies only to endangered species, a wildlife agency can extend the prohibition to cover "threatened" species by regulation. *See*

16 U.S.C. § 1533(d). NMFS extended the prohibition to cover threatened Puget Sound chinook salmon, with some exceptions not at issue here. *See* 65 Fed.Reg. 42422 (July 10, 2000). Coverage was reaffirmed when NMFS re-listed chinook salmon as "threatened" in 2005. *See* 70 Fed.Reg. at 37195.

In order to prevail on a Section 9 claim, a plaintiff is required to show by a preponderance of the evidence that the replacement of the Dry Slough tidegate has killed or chinook salmon that are unable to access Dry Slough, or that it more likely than not harassed them to such an extent as to "disrupt [their] normal behavioral patterns." *See Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir.2000). A "potential" or "hypothetical, speculative or conjectural injury" to the species is inadequate to establish Section 9 liability. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995); 64 Fed.Reg. at 60729.

Swinomish has presented evidence that the District's placement of the Dry Slough tidegate resulted in significant "take" of juvenile chinook salmon. In its 2006 Biological Opinion, the NMFS explained that juvenile chinook rely on estuarine habitat in order to grow to adulthood, and that as a result of the Dry Slough tidegate, juveniles can no longer use the Dry Slough habitat. *See* 2006 Biological Opinion at 6, 16–21. NMFS also found that the Dry Slough tidegate reduces the "extent and quality" of the habitat downstream of the tidegate by "eliminating tidal influence and reducing sediment deposition." *Id.* at 30. The Corps concurred with NMFS's opinion. *See* Pltf.'s Mot., Ex. 7.

■ The District has presented evidence that the act of replacing the tidegate (with regard to the areas 5–10 feet up- and downstream from the dike) did not cause a "take" of chinook salmon. *See* Pltf.'s Mot.,

Ex. 51 (the District's biological assessment submitted to the Corps as part of its "after the fact" permit application); Defs.'s Mot., Ex. K (a biological assessment the District procured for purposes of this litigation); Nelson Decl. (Dkt. # 32) ¶ 10 (stating that there were no fish present at the repair site during the replacement action); Wylie Decl. (Dkt. # 31) ¶¶ 11–12 (stating that no fish were killed during the replacement action). But the District's evidence is limited in scope: it considers only the effect of the replacement action itself, not the long-term effects of the structure on juvenile chinook. *See* 2006 Biological Opinion at 6. The District's attempt to rebut Swinomish's motion appears to stem from the mistaken belief that the Section 9 "take" prohibition relates only to the one-day act of replacing the tidegate, and not its long-term effects.

The Supreme Court has explicitly rejected the District's position, stating that Section 9 "harm" can result from indirect action. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 697–98, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) ("[U]nless the statutory term 'harm' encompasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of other words that § 3 uses to define 'take' "); *see also id.* at 704–05, 115 S.Ct. 2407 (stating that the legislative history of the ESA "makes clear that Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions").

Though the District has claimed that "reports" show an increase in estuarine habitat in some areas of the Skagit delta, *see* Defs.' Opp'n at 5, the District has not submitted these reports for the court's consideration. Swinomish has submitted evidence contradicting the District's claim. *See* Hood Decl. ¶¶ 9–11 (suggesting that the reports generally referenced by the

District either do not exist or contradict the District's contention). Though the NMFS 2006 Biological Opinion was not formally signed—due to the District's abandonment of its "after the fact" permit application—the court has been provided no reason to believe its findings and conclusions that a "take" resulted from the Dry Slough tidegate are untrue or inaccurate.

Because Swinomish has presented substantial evidence from which the court can conclude that the District's Dry Slough tidegate replacement led to a "take" of chinook salmon, and the District's rebuttal evidence is limited to an analysis of the direct action and not its long-term effects, Swinomish has met its burden to prove a Section 9 violation. The court concludes that Swinomish is entitled to judgment as a matter of law on this claim.

## IV. CONCLUSION

For the reasons stated above, the court concludes that the District has violated the CWA and the ESA, and therefore GRANTS Plaintiff's motion (Dkt. # 21) and DENIES Defendants' motion (Dkt. # 25). Defendants' motion for appointment of a settlement judge (Dkt. # 44) is DENIED as explained below.

Swinomish requested that, in the event that its motion was granted, the court defer imposing a remedy on the parties and allow them to negotiate a settlement. Swinomish requested that the court appoint a settlement judge to assist in that negotiation. Although appointment of a settlement judge has been requested by both parties, see Pltf.'s Mot. at 38 and Defs.' Mot. (Dkt. # 44), the court has not been informed that the parties have participated in mediation, as required by Local Rules W.D. Wash. CR 39.1(e). If mediation proves to be unsuccessful, the court would then consider a request for the appointment of a settlement judge.

Accordingly, the court defers imposing a remedy until October 17, 2008. If the court has not been notified by that date that the parties have negotiated a settlement, the court will direct the parties to submit briefing on the remedy issue. The court reminds the parties that until the case is finally resolved, the parties are not exempt from the obligations and deadlines imposed by the court's scheduling order, the Federal Rules of Civil Procedure, the local rules, or statute.

IT IS SO ORDERED.