**UNITED STATES of America, Plaintiff,**

v.

**CUMBERLAND FARMS OF CONNECTICUT, INC.,
Defendant.**

**Civ. A. No. 85–0846–Y.**

United States District Court,
D. Massachusetts.

Oct. 16, 1986.

Richard E. Welch, III, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Allan Van Gestel, Marjorie R. Corman, Goodwin, Procter & Hoar, Boston, Mass., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

YOUNG, District Judge.

At the inauguration of President Kennedy, Robert Frost read a poem which began: The land was ours before we were the land's. She was our land more than a hundred years Before we were her people.

Frost, R., "The Gift Outright," *The Poetry of Robert Frost,* Lathem, E. ed., at 348 (1969). In imagery strikingly parallel to the facts of this case, Frost evokes memories of the colonists who, without benefit of bulldozers and earth moving machinery, cleared the land in order to plant. Cutting away the bark, the colonists girdled the trees until they died and could be felled, moving the logs off the land and rendering it fit for agriculture. That done, they ditched the land to improve its drainage.

### I. Findings of Fact

Wetland soil is particularly attractive for agriculture since, in any wet or mucky soil, vegetation decomposes less rapidly than in the uplands. Termed "anerobic" to signal a lack of oxygen, this soil is rich in organic nutrients, its peat-like composition being ideally suited for planting. Throughout history farmers sought out this soil to clear and to cultivate. Such clearing has consequences, however, and today such traditional land use poses the single greatest threat to the nation's wetlands. As a consequence, the Court must now balance two enduring values: serving the needs of the present and safeguarding the dreams of the future.

In fact, it can be said that this case involves a test of what the nation has learned in the last three hundred years. On the one hand, Congress has signaled its desire to preserve our wetlands, an intent now codified in rather sweeping legislation, *see* 33 U.S.C. ch. 26, § 1251 et seq., and further codified in detailed and extensive regulations administered by the United States Army Corps of Engineers, *see* 33 C.F.R. ch. 11, § 320 et seq. On the other hand, the Court takes judicial notice that even in this industrial or post-industrial time, this country as breadbasket of na-

---

1. The Findings of Fact and Conclusions of Law in this action were originally dictated from the bench immediately following the trial. The Court reserved the right "to grammatically and editorially tighten up and recast the findings of fact in a more understandable fashion ... and ... to expand on the analysis of the law ...

supply[ing] other and further ... citations." While the dictated findings and rulings were sufficient to govern the course of the litigation, serve the litigants, and form the groundwork for any appeal, the case warrants a written opinion. This is that opinion.

tions represents the greatest agricultural success story in the history of the world.

### The Great Cedar Swamp

This case involves an area of land lying partly in the town of Halifax and partly in the town of Middleborough in southeastern Massachusetts. Consisting of approximately 2,000 acres, the land is now, and has been at all material times, known as the Great Cedar Swamp. From a saddle between two rolling hills to the south flow two brooks which, in 1977,[2] meandered northward encompassing between them the majority of the land known as the Great Cedar Swamp. The stream on the east is known as Raven Brook, and the stream to the west is known as Bartlett Brook. In 1977, the brooks snaked through the Swamp until each emptied into the Winnetuxet River to the north. Then and now, the Winnetuxet empties on the west and southwest into the Taunton River and the Taunton, in turn, empties into the Atlantic ocean. In fact, the Taunton is tidal as far north as the City of Taunton, some five to ten miles away from the Great Cedar Swamp.

In 1972 the area was covered in part by a soil of peat and in part by a soil characterized as muck, either shallow or deep. These soils are classified as "hydric," i.e. wet soil kept constantly moist by an high water table. Test borings taken in 1985 at various locations in the area confirm that, below the 30 foot contour line, layers of peat and sand or silt rest on a lower layer of clay. A brickyard immediately northwest of the site confirms the presence of clay in the subsoil. Soil borings coupled with expert testimony confirm that a majority of the acreage in question is or was a wetland, although areas within the original 2,000 acre swamp, roughly those above the 30 foot contour, are not now and, indeed, could not ever have been characterized as wetland. Many of these non-wetland heights, however, were at one time surrounded by wetland.

In 1977, the Great Cedar Swamp was a typical fresh water swamp. Portions remain so even today. Scientists term the swamp areas "pollustrian wetland" because they are dominated by sedges, ferns, moss, shrubs, cattails, bullrushes and distinctive varieties of trees. The ground cover of the Great Cedar Swamp included sphagnum moss, boneset, blue vervain, water-cress, smartweed, tear-thumb, swamp aster, bedstraw, reed canary grass, pond lilly, manna grass, broomsedge, bur-reed, pondweed, water weed, common duckweed, greater duckweed, pickerelweed, larger blue flag, arrow-arum, skunk cabbage, rush, beakrush or spike-rush, softstem bullrush, wood-grass bullrush, inflated sedge, silvery sedge, cattail, and royal fern. These plants grew in and around such shrubs as black alder, poison sumac, swamp azalea, grass-leaved willow, mountain holly, smooth alder, silky dogwood, and sweet gale. Although recognizing that the catalogue above stems from expert studies done in 1985, the Court infers that this flora, indigenous to swamp lands, was found in the area in 1977.

Beyond hosting plants and trees, the swamp and its adjacent damp woodlands support a large variety of bird life. Bird nesting grounds have been noted in this area for at least 35 years. Birds present today include the Ruffed Grouse, Downy and Hairy Woodpeckers, the American Crow, the Blue Jay, and the Black-capped Chickadee. Less extensive, but also present in the area over the past 35 years are the Veery, the Northern Waterthrush, the Northern Yellowthroat, and the Canada Warbler. The Northern Waterthrush and Canada Warbler are rarely found outside white cedar swamps.

The area also shelters the Red-Tailed hawk which the Court finds to have been present for at least the last 20 years. On several occasions, the Eastern Bluebird has

2. The year 1977 is important since the United States concedes for the purposes of this action that its goal of restoring the land reaches back in time no further than the state of the land as it existed on July 1, 1977, the effective date of the regulations which it claims subjected the Great Cedar Swamp to Corps of Engineers jurisdiction.

been found breeding in Red Maples in the swamp.[3]

Other animal life is now, and was in 1977, prevalent in the Great Cedar Swamp. Such animal life includes deer, raccoon, skunk, and frogs—evidence of which the Court observed on a view taken on March 17, 1986. The Court also saw a pheasant but, on the totality of the record before it, cannot infer the presence of pheasant in the area beyond the immediate time frame of the view.

On the present record, the Court cannot conclude that, prior to Cumberland's acquisition, any significant portion of the area was ever utilized for agricultural purposes, although there was a mill in or close to the area at one time. During World War II, the armed forces used a center strip of the swamp for a strafing run. Even recent aerial photographs capture a difference in vegetation growth which still marks the course of the strafing run.

In 1972, V.S. Hasiotis Incorporated ("Hasiotis") purchased the land in question. Shortly thereafter, Hasiotis leased the land to a related corporation owned by roughly the same group of shareholders, Cumberland Farms of Connecticut, Incorporated ("Cumberland"). At or about the time of purchase, Cumberland commissioned studies relative to possible use of the site for agricultural purposes. The Court finds that these studies would indicate to a reasonable farmer that, for the area to become productive farmland, the trees would have to be removed from the better portion of the land. Moreover, the level of the swamp would have to be lowered significantly by ditches which could both irrigate the land when dry and drain the land when excess water inundated the soil. These studies would indicate to a reasonable farmer that once cleared and drained, the mucky or peaty soil would be more than adequate for farming. In short, the land was ripe for conversion to agriculture, following methods little changed from colonial times.

Beginning in 1972 and working roughly from north to south, Cumberland endeavored to bring the Great Cedar Swamp into productivity as arable farmland. Sporadic but persistent, Cumberland's activities derive from its corporate resources and its corporate need. Clearing has occurred on a broad front both on the eastern and western sides of Raven Brook, reaching even to the far side of Bartlett Brook as well. Adjoining Fuller Street, a large field has been cleared, this field marking the approximate southernmost extension of cleared area. By 1977, a finger of cleared land just to the west of Raven Brook had already appeared. Today, areas about the southern tip of land have also been cleared and used as farmland.

By 1977, Cumberland had already installed a significant network of drainage ditches in the northernmost area and had straightened the meandering course of Raven Brook from approximately the midpoint of the property southward to the terminus of a dirt-packed farm road. In 1977 and 1978, the network of ditches on the western side of the property had extended only so far as the cleared land, and Bartlett Brook south of the cleared area still followed its normal meandering course.

From 1977 through 1985, Cumberland continued the process of clearing and ditching. Raven Brook was straightened throughout its entire length and Bartlett Brook, having earlier been straightened only in the portion where the land had been cleared, was straightened to the southern terminous of the property. In 1983, the headwaters of the two streams were joined by a ditch. The western boundary of the swampy portion of the site was ditched in 1983, all this work being performed by bulldozers and backhoes. Two farm roads

3. On May 8, 1977, an experienced ornithologist observed two Peregrine Falcons chasing a Northern Goshawk. The Court concludes, however, that the Great Cedar Swamp is not a critical nesting area for the Peregrine Falcon inasmuch as they have been successfully induced to nest on the roof of this very courthouse in Boston where they live by feeding on the abundant pigeon population which they catch in and above the city streets.

running parallel to Bartlett and to Raven Brook were in place by 1985. Over the period 1978 through 1985, Cumberland converted 674.4 acres of wetland or cut-over wetland to agricultural use. Cumberland cut down the trees with power saws, skidding the trunks out of the area in a normal lumbering operation. Cumberland then bulldozed the stumps and root systems in a process called scarification, removing in the process some of the topsoil. Once cleared and leveled, a layer of manure prepared the land for actual planting.

### Jurisdiction of the Army Corps of Engineers

At approximately the time that Cumberland Farms acquired the land on which the Great Cedar Swamp exists, the United States enacted various legislation designed to free the waters of the United States from pollution. In 1972, the United States, acting through the United States Army Corps of Engineers, to whom the task of regulation and supervision had been delegated, interpreted that mandate to deal only with the navigable waters of the United States. Manifestly, none of the water within the land here in issue is navigable.

In 1975, however, a United States District Court, sitting in the District of Columbia, held that the Corps of Engineers had too narrowly construed its mandate in light of the statutory language and directed the Corps to expand its regulations to embrace other non-navigable waters that could affect interstate commerce. *N.R.D.C., Inc. v. Callaway*, 392 F.Supp. 685, 686 (D.D.C. 1975). The Corps complied and, in 1975, issued interim regulations which asserted authority under § 404 of the Clean Water Act as it then existed, 33 U.S.C. 1344, as amended through P.L. 92–500, § 2, 86 Stat. 884, over waters not actually navigable. This assertion of control engendered considerable Congressional opposition. The controversy came to a head during Congress' consideration of the Clean Water Act of 1977, a major piece of legislation aimed at achieving interim improvements within the existing framework of the Act. Much of the controversy focused on a spe-cific exemption for existing agricultural activities. But, as the United States Supreme Court has pointed out, in the end Congress acquiesed in the broad administrative construction adopted by the Corps. *United States v. Riverside Bayview Homes, Inc.*, — U.S. —, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

This Court notes that the scope of the Corps' asserted jurisdiction over wetland was specifically brought to Congress' attention and Congress rejected measures designed to curb the Corps' jurisdiction, in large part because of Congressional concern that protection of wetlands would be unduly hampered by a narrowed definition of navigable waters. *Id.* at — U.S. at —, 106 S.Ct. at 461–65, *see also* S.Conf. Rep. No. 92–1236, p. 144 (1972) U.S.Code Cong. & Admin.News 1972, pp. 3668; 118 Cong.Rec. 33756–33757 (1972) (statement of Rep. Dingell). Possessed, then, of this broader authority to regulate, the Corps granted certain nationwide permits which exempted some activities from the requirement of obtaining specific permits to dredge or fill specific areas of the waters of the United States. Apparently oblivious both to this regulatory framework and the possibility of exemption under a nationwide permit, Cumberland Farms continued to drain, clear, and fill portions of Great Cedar Swamp.

On March 2, 1983, Ruth Ellen Geoffroy, a member of the Middleborough Conservation Commission, visited the property in response to complaints that the Great Cedar Swamp was being drained. During that visit Geoffroy saw a backhoe working along Bartlett Brook in an area not yet converted to cornfields. John Peck, Cumberland's Vice President for Operations and superintendent in the area, ("Peck"), informed her that Cumberland had recently constructed a drainage ditch along the perimeter of its property in the wooded area and was in the process of constructing an additional drainage ditch running more or less east and west within the wooded area itself. Geoffroy's own observations confirmed these admissions and revealed red

maples, recently cut, their stumps not yet moved, as well as disturbance of the mucky earth in the brook by the backhoe.[4]

Disturbed by what she had seen, Geoffroy returned on March 10th and March 16th to take additional photographs of the Bartlett and Raven Brook areas and the roadways which Cumberland had run along their banks. Soon thereafter, she complained to the Massachusetts Department of Environmental Quality Engineering and the United States Corps of Engineers. Her complaints were the first indication that the Corps had of alleged violations of the Clean Water Act by Cumberland in the Great Cedar Swamp.

The Corps acted promptly in light of these complaints and, on April 15, 1983, Lieutenant Colonel Arthur N. Rappaport, Deputy Division Engineer of the Corps of Engineers ("Rappaport"), wrote Peck a letter noting that discharges were apparently being made into the waters of the United States. Rappaport pointed out that Cumberland had never sought a permit for such discharges and asserted the jurisdiction of the Corps over the area. The letter expressly stated that Cumberland Farms should not perform any further work within the areas subject to Corps jurisdiction until federal authorization was received. The Corps recommended that exposed stream banks along Bartlett and Raven Brooks be stabilized and requested further, detailed information. On May 4, 1983, Cumberland responded by taking the position that its activities fell within the agricultural exemptions set forth in 33 U.S.C. § 1344(f)(1)(A), (C), and (E) and maintaining that it had not made any discharges into the waters of the United States.

Subsequent to the first notification of a complaint, and at all material times thereafter, Cumberland has in an appropriate and reasonable fashion permitted access to its land for inspection of its activities. On April 3, 1983, Elizabeth Ann Koulaheras, a Senior Marine Fisheries Biologist for the Massachusetts Department of Environmental Quality Engineering, inspected the property and observed an area of cornfield being extended by bulldozing earth into a swamply wetland, destroying in the process the sphagnum moss, swamp azalea, cattails, and other flora that grew there naturally.

On April 5, 1983, Janet Clare O'Neill, a Senior Staff Wetlands Engineer employed by the Corps of Engineers ("O'Neill"), made a general survey of the area. Although she did no detailed study, O'Neill concluded that the area was in fact a fresh water wetland subject to the jurisdiction of the Corps pursuant to the Clean Water Act. This determination was based upon her observation of those forms of plant life which grow only in hydric soil. O'Neill observed also that various brooks had been straightened from their normal meandering course. Some of this work appeared recently completed, while other modifications marked by eroding banks collapsed into the water appeared to have been completed some time in the past.

Without waiting for further Corps' action, Cumberland made a preemptive strike on June 10, 1983, commencing in this Court an action against the Secretary of the Army, the Chief of Engineers, and the Corps of Engineers for declaratory judgment seeking to vindicate its interpretation that its land was not within the jurisdiction of the Corps. Approximately a month later, on July 8, 1983, the Department of Environmental Quality Engineering commenced an action against Cumberland Farms in the Massachusetts Superior Court sitting in the County of Suffolk seeking to prevent what it termed violations of the Massachusetts Wetland Protection Act, *see generally* Mass. Gen. Laws ch. 131, § 40, and requesting immediate injunctive relief. At the time of the commencement of this action, Cumberland had almost 1,400 acres of land under cultivation and was preparing to cultivate the remaining five hundred

---

4. The Court notes that at the time of Geoffroy's visit in March, 1983, two inches of rain had just fallen on southeastern Massachusetts, and the Court infers that the water table was as high as it ever routinely got in the area in question.

acres. In both the federal and state actions, Cumberland took the position that it was exempt from regulation because the land was in agricultural use. *See* 33 U.S.C. § 1344(f)(1) and 310 Code of Massachusetts Regulations, § 10.04 (1983).

On September 9, 1983, the Corps moved to dismiss the federal action on the ground that it had not yet determined whether, in fact, it was going to assert jurisdiction over the property. The Corps argued that the suit brought by Cumberland was premature and improvident until such time as the Department of the Army, through its Corps of Engineers, actually asserted jurisdiction, thus establishing a genuine controversy. On the record now before it, the Court finds that move by the Corps of Engineers totally inexplicable in view of the Rappaport letter of April 15, 1983.

Agreeing with the position taken by the Corps, another judge of this court dismissed the federal action on May 25, 1984. In the same time frame, the Massachusetts suit was reported by a justice of the Superior Court to the Massachusetts Appeals Court. On October 23, 1984, that court held that the action by the Massachusetts Department of Environmental Quality Engineering was premature because, under the Massachusetts Wetlands Protection Act, such action ought commence with the local community, advancing to the courts only if the litigants were dissatisfied with the determination of the local conservation commission. *Department of Environmental Quality Engineering v. Cumberland Farms of Connecticut, Inc.*, 18 Mass. App.Ct. 672, 469 N.E.2d 1286 (1984).

In sum, this Court finds that a year-and-a-half after the initial report of alleged violations of the Clean Water Act, so far as this record shows, the Corps of Engineers had not yet determined whether it had jurisdiction and no state regulation of the area was in effect. The Court finds that the matter was thereafter brought before the local conservation commissions in both Halifax and Middleborough where each community individually determined that, under Massachusetts law, the entire Great Cedar Swamp was exempt from local regulation under the Massachusetts exclusion for agricultural use.

This matter again came to the attention of the Corps in December, 1984, apparently through a press clipping mentioning the Corps. On December 23, 1984, Lieutenant Colonel Edward D. Hammond, acting for Colonel Carl B. Siple, the Division Engineer, communicated with counsel for Cumberland stating unequivocally that the Corps was asserting jurisdiction over the area in question, pointing out alleged violations of the Clean Water Act, and demanding that eight interim protective measures be undertaken immediately. This unequivocal assertion of jurisdiction and demand for action led to a series of meetings and eventually resulted in the erection of a culvert with sluice gates in the Bartlett Brook. Evidently, because either the culvert was too small or because it was inadequately erected, it did not channel the water through its course, thus rendering the sluice gate useless.

Beyond that, however, Cumberland objected to the interim protective measures because, as events bore out, operational sluice gates would have had the effect of inundating certain areas of Cumberland's cornfields. Although this was the effect intended by the Corps in order to restore the wetlands, inundation would have reduced Cumberland's acreage under cultivation. Cumberland therefore balked and officially requested a retroactive permit to validate the ditching and filling in which it had engaged from July 1, 1977 to date. The Corps refused to issue such a permit or even entertain Cumberland's application until such time as Cumberland implemented the interim protective measures which the Corps desired. The matter at a standstill, Cumberland removed the culvert from Bartlett Brook and left it lying on the side of the brook where it remains to this day.

### The View

Pursuant to this action which commenced in June, 1985, the Court took a view of the Cumberland property on March 17, 1986. The view involved an aerial overflight and

circling by helicopter, driving the perimeter and, on at least two occasions, a hike of two or three hundred yards into the interior of the Cumberland property. The factual matters which may be inferred from the view all corroborate the facts drawn from the testimonial and documentary record. The Court observed numerous white pine in the area, their growth consonant with a drained and receding wetland. The Court also observed a type of sedge, probably the tussock sedge. Although it was March, a wet time of the year, the level of the swamp appeared to be a good two or three feet, if not more, below the evident root system. Expert testimony confirmed this impression. In an upland area close to a swampy section, the Court also noted a plant known as the common mullein or *verbascum thapsis* which expert testimony established to be an invasive plant, a type which enters an area as the wetland recedes. Earlier, the Court adverted in its findings to inferences drawn about the historic animal population from testimony concerning current fauna. The Court's view confirmed such evidence even though its survey took little more than two-and-one-half hours and primarily involved the perimeters of the property. The Court concludes that both bird and animal life are abundant in the area.

Further factual findings are set forth, where warranted, in the course of the discussion which follows.

## II. Conclusions of Law

■ As remarked above, this litigation grows out of Cumberland's desire to farm its wetland more productively and the Army Corps of Engineers' duty to regulate wetland use under the Clean Water Act, 33 U.S.C. §§ 1251–1376. Unfortunately, these interests are not compatible.[5] The applicable statute seeks to eliminate "the discharge of pollutants into navigable waters," 33 U.S.C. § 1251(a)(1) (1978), and "to restore and maintain the chemical, physical and biological integrity of the nation's waters," 33 U.S.C. § 1251(a) (1982). These

purposes are "achieved by compliance with the Act, including compliance with the permit requirements." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 315, 102 S.Ct. 1798, 1804, 72 L.Ed.2d 91 (1982). The permit system is administered by the United States Army Corps of Engineers which regulates the discharge of dredged or fill materials into "navigable waters." *See* 33 U.S.C. §§ 1311, 1344 (1982).

The Act defines navigable waters as "waters of the United States" and this definition includes wetlands. 33 C.F.R. § 323.2(a) (1985). A unanimous Supreme Court recently upheld the Corps definition of wetlands:

> [Wetlands] means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalance of vegetation typically adopted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2(c) (1985), *United States v. Riverside Bayview Homes, Inc.*, — U.S. ——, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (construing the 1977 definition, the Court noted that the 1982 definition is "substantially identical.") *Id.* 106 S.Ct. at 458. Addressing itself directly to § 404, the United States District Court for the District of Columbia interpreted the term "navigable waters" to "assert ... federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution" and refused to limit the term to "the traditional tests of navigability." *N.R.D.C., Inc. v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975). In keeping with this breadth, the Supreme Court recently held that "navigable waters" includes water areas "adjacent to" navigable water. *United States v. Riverside Bayview Homes, Inc.*, — U.S. ——, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

As relevant to the instant matter, the statute regulates the discharge into wet-

---

5. *See generally* Caplin, *Is Congress Protecting Our Water: The Controversy Over Section 404,* *Federal Water Pollution Act Amendments of 1972,* 31 U. Miami L.Rev. 445 (1977).

lands of pollutants, a term which includes "dredged soil ... rock, sand [and] cellar dirt." 33 U.S.C. § 1362(6) (1978). Federal regulation is achieved through a permit system, a process which is "[t]he cornerstone of the ... scheme for cleaning up the nation's waters ...," *United States Steel Corp. v. Train,* 556 F.2d 822, 829 (7th Cir.1977), as cited in *United States v. Huebner,* 752 F.2d 1235, 1239 (7th Cir.1985). Apparently, however, Congress sought to calm fear that the decision in *N.R.D.C., Inc. v. Callaway* would result in an unlimited expansion of the Corps' jurisdiction by providing for the specific exclusion of certain activities from regulation by permit. Accordingly, the statute now excludes or exempts certain activities as follows:

(f) Non-prohibited discharge of dredged or fill material

(1) Except ... the discharge of dredged or fill material

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

.   .   .   .   .

(C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

.   .   .   .   .

(E) for the purpose of construction or maintenance of farm roads or forest roads ... where such roads are constructed and maintained, in accordance with best management practices to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized.

.   .   .   .   .

is not prohibited by or otherwise subject to regulation under this section....

33 U.S.C. § 1344(f)(1), added December 27, 1977, Pub.L. 95–217, § 67(b), 91 Stat. 1600. To apply these standards, Cumberland's conduct must be analyzed by a contextual review of its "total activities." *See Avoyelles Sportsmens' League, Inc. v. Marsh,* 715 F.2d 897, 926 (5th Cir.1983). The characterization of Cumberland's current farming turns on an analysis of whether such activities are "established and continuing." *Id.* at 925. At least in passing, Cumberland argued that its agricultural use has historical antecedents that bring the site under the exemption as "established and continuing" farming activity. This argument fails for several reasons.

First, this Court has found no persuasive evidence that any portion of this site was farm land prior to Cumberland's acquisition and, however compelling the evidence of Cumberland's purchase of the site for agriculture and its actually farming a portion of the site prior to the effective date of federal regulation, the history of a site is not dispositive of the legal issues facing the Court. *United States v. Ciampetti,* 20 E.R.C. 1926, 1933 (D.N.J.1984) ("[A]lthough the court is ... fascinated by the history of the site ... for purposes of the present controversy that history is of purely scientific value and is not dispositive of the legal issues before the court"). Second, the Fifth, Seventh, and Ninth Circuits have construed the Section 1344(f)(1) exemptions narrowly. *See United States v. Akers,* 785 F.2d 814, 819, 823 (9th Cir.1986); *United States v. Huebner,* 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 925 n. 44 (5th Cir. 1983).

This narrow construction recognizes the statute's legislative history. Senator Edmund Muskie sponsored the legislation and his remarks are to be given substantial weight. *See United States v. Akers,* at 819, citing *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976); *Environmental Fund, Inc. v. Cos-*

*tle,* 636 F.2d 1229, 1243 n. 48 (D.C.Cir. 1980). Senator Muskie explained:

> New subsection 404(f) provides that Federal permits will not be required for those narrowly defined activities that cause little or no adverse effects either individually or cumulatively. While it is understood that some of these activities may necessarily result in incidental filling and minor harm to aquatic resources, the exemptions do not apply to discharges that convert extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body.

3 Leg.Hist. 474 (1977).[6]

■ Moreover, even if Cumberland could establish that it is exempt from the permit requirements under § 1344(f)(1), it must also demonstrate that its activities avoid "recapture" under the provisions of 33 U.S.C. § 1344(f)(2). *See United States v. Akers,* 22 E.R.C. 1238, 1243 (E.D.Cal.1985), *aff'd* 785 F.2d 814 (9th Cir.1986). Section (f)(2), the "recapture provision," seizes upon certain activities which on their face appear exempt in order to bring them back under the statute. *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d at 926 (5th Cir.1983). As a result, in order to be exempt from regulation, Cumberland's discharge must not only fall within (f)(1), but also must escape recapture by (f)(2).

In relevant part, § 1344(f)(2), added Dec. 27, 1977, Pub.L. 95–217, § 67(b), 91 Stat. 1600 provides:

> Any discharge of dredged or fill material into navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced shall be required to have a permit under this section.

Many courts have found those activities which extensively change a wetland's hydrologic regime are subject to the requirement that a Corps permit be obtained before proceeding. *United States v. Akers,* 785 F.2d 814, 822 (9th Cir.1986); *United States v. Huebner,* 752 F.2d 1235 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983). As the manifest intent of Congress was to prevent the conversion of wetlands to dry lands, "the substantiality of the impact on the wetland must be considered in evaluating the reach of section (f)(2)." *United States v. Akers,* at 822. Reading the exemptions of § 1344(f)(1) narrowly and the recapture provision broadly, *United States v. Akers,* 22 E.R.C. 1238, 1243 (E.D.Cal.1985), *aff'd* 785 F.2d 814 (9th Cir. March 26, 1986), the Court holds that subsequent to July 1, 1977, Cumberland converted a wetland hydrologic regime and that such modifications required a permit.

In fact, Cumberland straightened and channelized both Raven and Bartlett Brooks, effectively draining the land. This project cannot be described as "minor," either individually or in a contextual analysis of Cumberland's "total activities." Rather, Cumberland's activities involve precisely what is prohibited: the wholesale modification of a major aquatic system having an adverse effect, both individually and cumulatively. The statute prohibits Cumberland's actions because their demonstrable effect is to convert extensive areas of water into dry land, impede water circulation, and reduce the reach and size of the water body.

Cumberland has altered the hydrologic cycles once operative in the Great Cedar Swamp to the extent that, unchecked, Cum-

---

**6.** Senator Muskie also remarked "[T]he exemptions do not apply to discharges that convert extensive areas of water to dry land or impede circulation or reduce the reach or size of the water body." 3 Leg.Hist. 475 (1977). *See also* Representative Harsha: Congress intended to exempt from the permit process only "narrowly defined activities ... that cause little or no adverse effects either individually or cumulatively [and which do not] convert more extensive areas of water into dry land or impede circulation or reduce the reach and size of the water body." 3 Leg.Hist. 420.

berland's development would have the effect of draining it completely. The Court rules the Cumberland property to be wetlands under the Corps' definition and further rules that no applicable statutory exemption applies. Accordingly, subsequent to July 1, 1977, Cumberland could lawfully engage in dredge and fill activities in those areas of the Great Cedar Swamp not then converted to agriculture only pursuant to a Corps of Engineers' permit.

■ This analysis does not dispose of the matter, however, because Cumberland now argues that certain "nationwide" permits excuse it from obtaining a specific or individual permit.[7] *See* former 33 C.F.R. § 323.4–2(a)(1) (the "headwaters permit") and current 33 C.F.R. § 330.3(b) (the "unasserted jurisdiction permit"). The first authorizes the discharge of dredged or fill material into water, including wetlands, as long as the discharge takes place above the headwaters of a non-tidal river or stream. The second appears to exempt work undertaken in water bodies over which the District Engineer of the Army Corps of Engineers was not asserting jurisdiction at the time the activity occurred.

### The "Headwaters" Permit

The nationwide permit for "headwaters" allows discharges of dredged or fill material into "non-tidal rivers, streams and their impoundments including adjacent wetlands that are located above the headwaters." 47 Fed.Reg. 37146, as codified at 33 C.R.F. 323–4–2(a)(1) (1977), *see* 33 C.R.F. 330.5 (1985). The Court finds that in March of 1986, the cubic feet per second of water flow might be calculated at various points in the Cumberland Farms subject area by reference to the standard gauge in operation for many years. The standard gauge is located a short distance south of the intersection of the Winnetuxet and Taunton

Rivers toward the ocean. While the Taunton River is tidal at least as far north as Taunton, its tidal nature has no effect on the standard gauge which measures a watershed of 260 square miles. The area drained averages a flow rate of 434 cubic feet per second. This works out to a flow rate of 1.7 cubic feet per second per square mile of contributing drainage area.

The Corps used this figure to calculate the cubic feet per second of the flow from more discrete watersheds up the Taunton, the Winnetuxet, and all of its tributaries, including Raven and Bartlett Brooks. Given a standard measure from the state farm gauging station of 1.7 cubic feet per second per square mile of contributing drainage area, it takes 2.9 square miles of drainage area to create a waterflow of five cubic feet per second. Inferentially, any drainage area draining less than 2.9 square miles of drainage area will have a flow of less than five cubic feet per second. Specifically, the Court finds that, in 1986, at the intersection of Raven Brook and the Winnetuxet River an average flow rate of 5.6 cubic feet per second exists over a drainage area of 3.2 square miles. At the point where Bartlett Brook drains into the Winnetuxet River, the water is moving at 8.2 cubic feet per second.

Cumberland Farms points out that it is hardly possible, and indeed the United States concedes as much, that at the point where the streams enter land owned by Cumberland Farms they are moving at a flow rate of five cubic feet per second. The Court concludes that the brooks must move at a rate less than five cubic feet per second where they enter the Cumberland property but finds that upon emerging the brooks are moving faster than the rate (five cubic feet per second) below which the headwaters permit would apply. Cumberland asks the Court to find the point in the

---

7. At one point in this litigation, Cumberland was asked by Interrogatory: "Do you contend that any of your activities in connection with the subject property qualifies for any nationwide permit pursuant to 33 C.F.R. Part 330 or any *other general permit issued by the Corps of Engineers?"* Cumberland Farms answered:

"No." Interrogatory 42; Answer of Cumberland Farms to Plaintiff's First Set of Interrogatories, June 11, 1985. The United States does not, however, argue that Cumberland is estopped by these answers from pressing these arguments at trial. The Court, therefore, deals with them here.

swamp where the brook moves exactly at five cubic feet per second and apply the headwaters nationwide permit above that point, at least until December of 1984 when the regulations were amended to render this exemption inapplicable to Cumberland's activities. The Court declines to do so because such an attempt to fix a point would be sheer speculation. Moreover, the Court is not persuaded that this process lends itself to solution by a mathematical formula, simply by figuring backwards up through the various drainage areas as discerned from topographical maps. Rather, the Court would need to return to the area and actually calculate the drainage area or obtain further expert evidence thereon. The Court declines to re-open the evidence and notes that Cumberland bears the burden of proving that its activities come within the ambit of a nationwide permit.

In any event, the United States argues that the headwaters permit excludes any action which would destroy or adversely modify a critical habitat of a threatened or endangered species. 33 C.F.R. § 330.-5(b)(3). The evidence before the Court demonstrates that, although the Peregrine Falcon is an endangered species, the Great Cedar Swamp cannot be found to be its critical habitat. *See* n. 3 above. While the United States falls back on evidence that the Eastern Bluebird is endangered, the Court is not persuaded. The Eastern Bluebird is considered threatened only on a list approved by the Commonwealth of Massachusetts. However, should it prove significant, the Court finds that the swampy area of the Great Cedar Swamp is a critical habitat of the Eastern Bluebird.

These findings as to endangered bird life are thus not sufficient to redeem the case for the United States were it not for the prohibition against erosion and other non-point sources of pollution found in the regulation. It is clear, and the Court so finds, that the drainage ditches erected, despite Cumberland's best efforts, are not so fixed in their banks as to prevent a significant amount of silty erosion from entering the waters discharged. At least as to Raven Brook there is photographic evidence un-mistakably showing such erosion and turbidity in the water. The Court infers that the ditching, while it drains the area, makes the water velocity increase, an effect which, in turn, increases the water's erosive force. Accordingly, the Court finds that a greater degree of erosion is occuring now that these drainage ditches are in place and the streams have been straightened.

With respect to Bartlett Brook, the finding must be inferential because there is no photographic evidence of such erosion or turbidity. The Court, then, makes such findings based on the inferences it draws from testimony about the eroding banks and that the streams have been ditched at various times. The Court reasons that erosion observed in the banks must shed silt somewhere and, if signs of bank erosion have increased, so too must have the silt shedding. Therefore, the Court concludes that the "headwaters" permit does not apply.

The "Unasserted Jurisdiction Permit"

■ Much more serious is the sweeping nationwide permit granted by the Corps and codified at 33 C.F.R., § 330.3 (1985). In relevant part, § 330.3 reads:

> The following activities are permitted by a nationwide permit which was issued on July 19, 1977 and need not be further permitted.... Structures or works completed ... in water bodies over which the District Engineer was not asserting jurisdiction at the time the activity occurred provided, in both instances, there is no interference with navigation.

Cumberland did nothing to interfere with navigation here. Moreover, the first time the Corps asserted jurisdiction over the Great Cedar Swamp was by Colonel Siple's letter of December 28, 1984 to Cumberland. Accordingly, if the "Unasserted Jurisdiction Permit" applies to the Great Cedar Swamp, the conduct of Cumberland will remain free of Corps regulation until December 28, 1984. Upon reflection, however, the Court concludes that the "Unasserted Jurisdiction Permit" has no applica-

bility to the Great Cedar Swamp and Cumberland's activities became subject to the Corps regulation on July 1, 1977, the date when the phased-in definition of wetlands came to be applicable to Cumberland's property.

An understanding of § 330.3(b) requires a discussion of the enabling statutes upon which the Corps' regulations are based. The primary foundation of the Corps' authority is § 404 of the Clean Water Act, 33 U.S.C. § 1344. There is, however, another statute under which the corps operates, namely the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401–418. The Corps has regulated traditionally navigable waters under this law since the turn of the century. The Rivers and Harbors Act originally was enacted to give the Corps power to regulate waters within and adjacent to the United States in order to control and facilitate navigation. That goal remains a principal reason for the Rivers and Harbors Act, but it is no longer the only one. The Rivers and Harbors Act is now used also as a means to regulate pollution in navigable waters. *See* 33 C.F.R. § 320.1 (1985). *See also Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970).

The principal provision under the Rivers and Harbors Act is § 10, 33 U.S.C. § 403. That section prohibits the creation of any potential obstruction to navigation in waters of the United States, without a permit from the Corps of Engineers. The principal difference between § 404 of the Clean Waters Act and § 10 of the Rivers and Harbors Act is that the Rivers and Harbors Act applies to work or structures in water that is actually navigable in the traditional legal sense. In contrast, the Clean Waters Act applies to any discharge or addition of pollutants into a much broader category of waters, namely navigable and non-navigable "waters [including wetlands] of the United States." An explanation of these statutes and the differences between them is found in the Corps' regulations. *See* 33 C.F.R. §§ 320.1, 320.2. *Compare* 33 C.F.R. Part 322 *with* Part 323; and § 323.2(a) *with* §§ 323.3(b), 32.2(a) and Part 329. *See*

*also Reid v. Marsh,* 20 Env't. Rep. Cases (BNA) 1337 (N.D. Ohio 1984).

General or nationwide permits are granted under the regulatory schemes of both statutes. A nationwide permit obviates the need for individual permits for activities within the defined category. *See* 33 C.F.R. § 330.1 (1985). Nationwide permits under both the Clean Waters Act and the Rivers and Harbors Act were created administratively by the Corps in a rulemaking in 1977. *See* the preamble discussion to 33 C.F.R. Parts 320–329 (1977), 42 *Fed.Reg.* 37122, 37126 col. 2 [general permits under § 404] (July 19, 1977). Subsequently, Congress ratified the Corps' authority to promulgate such permits under the Clean Water Act. § 404(e), 33 U.S.C. § 1344(e). As originally codified, the nationwide permits were contained in separate parts of the Corps regulations, Part 322 for the Rivers and Harbors Act permits, and Part 323 for the Clean Waters Act permits. *See* the 1977 regulations and preamble cited above.

In 1982, the Corps combined the nationwide permits into one portion of its regulations, new Part 330. Preamble discussion, 47 *Fed.Reg.* 31794, 31798–31800 (July 22, 1982). This is the part where both Rivers and Harbors Act § 10 and Clean Waters Act § 404 nationwide permits are now codified.

In the recodification, the Corps stated that many of the nationwide permits were meant to satisfy the requirements of both the Rivers and Harbors Act and the Clean Waters Act, but that some of them may, by their terms, still only apply to one or the other law. 33 C.F.R. § 330.1 (1985). Courts have recognized a continuing difference between some § 10 and § 404 nationwide permits. *See Orleans Audubon Society v. Lee,* 742 F.2d 901, 905–06, 906 n. 9, 911–12 (5th Cir.1984).

The "Unasserted Jurisdiction Permit" applies only to "structures or work completed ... in waterbodies over which the District Engineer was not asserting jurisdiction at the time the activity occurred ..." 33 F.R. 330.3(b) (1985). The definitional section of part 330 provides that the definitions con-

tained throughout the balance of the Corps rules apply. 33 C.F.R. § 330.2(a) (1985). "Structure" and "work" are defined in the Corps regulations. Both definitions are found in 33 C.F.R. § 322.2.[8]

The term "structure" includes any "pier, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction." Cumberland's activities do not fit within this definition.

Similarly, its activities are not "work" under § 330.3(b). "Work" is defined as "any dredging or disposal of dredged material, excavation, filing or other modification *of a navigable water of the United States.*" § 322.2(c) (emphasis added). For an activity to be "work," it has to be in "navigable waters of the United States." Section 322.2(a) defines "navigable waters of the United States" as "those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark, and/or presently are used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. *See* 33 C.F.R. part 329 for a more complete definition of this term." In other words, activities are not "work" unless they occur in traditionally navigable Rivers and Harbors Act § 10 waters. As Cumberland itself points out in its trial brief at pages 6–8, Bartlett and Raven Brooks and the Great Cedar Swamp are not navigable in fact, and do not fall within the jurisdiction of the Rivers and Harbors Act.[9] The Unasserted Jurisdiction Permit does not apply to the area of the Great Cedar Swamp.

**Injunctive Relief**

■ The parties agree that the legal framework for determining whether a restorative injunction is appropriate is found in *United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1301 (5th Cir.1976). *See United States v. Weisman,* 489 F.Supp. 1331, 1343 (M.D.Fla.1980: *United States v. Bradshaw,* 541 F.Supp. 880, 883 (D.Md.1981). Any such restorative mandatory injunction must meet three criteria. First, it must confer maximum environmental benefits; second, it must be achievable as a practical matter; third, it must bear an equitable relationship to the degree and kind of wrong which it is intended to remedy.

The United States has proposed a specific restorative plan with four major aspects. First, the United States proposes to restore the water level in the Great Cedar Swamp to that obtaining as of July 1, 1977. The United States proposes to restore the pre-existing water level by filling certain ditches within the swamp excavated by Cumberland and, on the two major natural water courses of the area, erecting a series of check dams which would cause the water to flow around and over the earthen dam structure itself, resulting in the flooding of areas previously drained by Cumberland. This, when coupled with two water control structures which the Corps proposes be erected at the downstream terminus of each of Raven and Bartlett Brooks where they exit the restored area of the swamp, will result in raising the water level.

In addition, the Corps proposes that cornfields be destroyed within the site to be restored and that bulldozers create a series of hummocks and hollows which, in the Corps' view, will best replicate the natural

---

**8.** Where these definitions are codified has relevance in and of itself. Part 322 is the section of the Corps' rules dedicated to regulation under § 10 of the Rivers and Harbors Act. Part 322 does not apply to the Clean Water Act and § 404. *See* 33 C.F.R. § 322.1 (1985).

**9.** Some degree of confusion has been caused by the fact that both the Rivers and Harbors Act and the Clean Waters Act employ the terms "navigable" and "waters of the United States."

The Corps has tried to avoid this confusion in its rules by using the phrase "waters of the United States" to connote the more encompassing reach of the Clean Waters Act, and the phrase "navigable waters of the United States" to connote the lesser reach of the Rivers and Harbors Act. *Cf.* § 323.2(a) (waters under the Clean Waters Act) with §§ 323.2(b), 322.2(a), and Part 329 (waters under the Rivers and Harbors Act).

surface topography of this particular type of swamp.

Third, the Corps proposes that the cornfields turned into hummocks and hollows be mulched with strips of surface vegetation including a variety of propagules—those portions of plant life such as seeds, roots and the like, from which full plants may thereafter be grown. The Corps proposes to plow narrow strips from the existing swamp area, cart them out to the hummock and hollow area, and mulch that area with them so as to spread natural vegetation over the destroyed cornfields in a great variety, consistent with the flora presently extant in the swamp.

Finally, the Corps proposes that Cumberland may protect those cornfields devoted to agricultural use prior to 1977 by an earthen dam and ditch along the border of the area to be restored.

The Court considers first whether this plan will confer maximum environmental benefits not only on the immediate area—the Great Cedar Swamp, including the restoration area itself—but on the immediately surrounding area, the general waters of the United States, and the environmental balance in southeastern Massachusetts. The United States bears the burden of demonstrating that its plan will confer the maximum environmental benefits.

A variety of considerations cut against the plan. First, the plan will result directly in the destruction of over an hundred acres of productive farmland, presently devoted to the growing of corn—a use which, had it not occurred in a wetland, would not only be sanctioned by the policies of both the United States and the Commonwealth of Massachusetts, but encouraged by those sovereigns.

Second, the proposed plan creates an increased risk of damage to certain cranberry bogs immediately south of the site proposed to be restored. There exists the risk that those bogs, which were extant and operating before the Great Cedar Swamp

ever came under the jurisdiction of the Corps, will be damaged by an increase in the ground water level and that the ability of the bog owners to drain the bogs rapidly, an important aspect of cranberry culture, will be inhibited. On this record, the Court cannot say that such interference with these bogs is a likelihood or an inevitability, but it certainly is a possibility on this record, one which must be recognized.

Third, subsequent to July 1, 1977, five homes have been built hard by the eastern border of the swamp area to be restored, and a sixth has had a septic system installed. These five new homes, erected along Fuller Street during 1983 and 1984, achieve their septic drainage through a series of septic tanks which comply in all respects with Title V of the Massachusetts Sanitary Code. Indeed, the four new houses erected to the west of Fuller Street[10] all have cellars which extend approximately seven feet below the ground level. The houses themselves are all on or above the 30 foot contour line on maps having reference to the data base used for all calculations herein and in the final judgment. Even so, it is a distinct possibility that raising the level of the water in the Great Cedar Swamp in the manner in which the Corps proposes could have the effect of flooding the basements of these houses and in effect destroying their septic systems, diminishing the value of their land in a town which has no town sewage in this particular area.

Then, too, it is clear that if the swamp area is restored to the level existing in 1977, a great deal more surface water will be exposed to the air. That, of course, is the goal of the restoration. Likewise, such restoration would cause the streams and the surface water to be far more stagnant than the draining, ditching, and filling operations of Cumberland have caused it to be. It is undisputed that such stagnant, swampy water will, among other insect life, be an haven for the breeding of mosquitoes. The Court takes judicial notice, Fed.R.Evid.

---

**10.** The Court makes no finding with respect to a certain log cabin erected to the east of Fuller Street.

201(b), that southeastern Massachusetts has in the past five years been the source of a few cases of Eastern Equine Encephalitis, a disease borne by mosquitoes which is sometimes fatal.

Weighing against these concerns, there are a variety of considerations that favor restoration of the swamp. Restoration of the site will play a role in flood control. While this particular site is not a water recharge area to any significant degree, since the ground and surface water sits on a rather hard and impervious clay substrate, restoration of the area will slow down the water flow, serve to prevent flood surges, and assist in the natural regulation of the water flow from the headwaters of the Raven and Bartlett Brooks down through the Winnetuxet and Taunton Rivers. The area, therefore, like most wetlands, functions as a flood storage area for this part of Massachusetts.

Moreover, the restoration of the Great Cedar Swamp can be expected to significantly improve the functioning of that particular wetland as a biological filter, one which will serve naturally to improve the quality of the water downstream. This is accomplished by slowing up the water, causing it to meander through the swamp and be naturally filtered through all the natural organic material in the swamp.

Finally, restoration of the area in the manner proposed by the Corps will have a direct improvement on the animal habitat. The Great Cedar Swamp is one of the largest remaining wetlands in Massachusetts. It is bordered by the Little Cedar Swamp to the east. The whole idea of strip mulching a variety of flora around and over the destroyed cornfields is to maximize the potential for restoring the area as a nesting and breeding place for all those natural species, both flora and fauna, which during former times existed in the swamp. In order to have a full array of animal and bird life in a swampy area of this sort, a swamp of a certain size must be maintained. This is so because the animal and bird life in a swamp of this sort need a certain territorial range. The failure to restore the Great Cedar Swamp to its 1977 boundaries would not simply restrict plant and animal life to the portion of the swamp as yet undisturbed, but it could well serve to cause particular species to leave the area altogether—an irreparable loss. The controlling law tips the balance in this case in favor of a restorative injunction. Certainly the controlling law favors the restoration of wetlands which have been adversely affected without a permit and contrary to law. Indeed, unless the balance cuts significantly against a restoration of the environment to the status that it enjoyed when the legislation with respect to this land took effect in 1977, restoration ought be ordered. "The intricate web of interdependence which characterizes our environment requires that we look beyond the present and immediate in assessing the value of any particular element of the environment or of gauging the harm that will accrue from its destruction." *United States v. Weisman,* 489 F.Supp. 1331, 1346 (M.D.Fla. 1980) (Scott, J.). In *Weisman,* Judge Scott thoughtfully and precisely articulates the legislative intent that the nation's wetlands be preserved. Therefore, despite the recognized possibility of adverse consequences to immediate abutters, a restoration of the site to the status it enjoyed in 1977 is in the public and the national interest and consistent with the controlling law and, therefore, as this Court interprets the controlling standard, maximizes environmental benefits.

The second consideration concerns the practicability of achieving a restoration of the site to its condition as of 1977. It is appropriate and reasonable to gauge the 1977 level of the swamp from the growth of the tussock sedge along the borders of the natural water courses within the swamp. The Court finds that level to be between 25 and 26 feet above the standard data base. The Court recognizes that, with respect to the bulldozing of hummocks and hollows and the strip mulching, the proposed restoration project is somewhat experimental and untested. It may be, as counsel has noted, that the Court will become "the architect of a great mud pond."

On the totality of the record before it, however, the Court finds this unlikely. The proposal made by the Corps is both technically competent and innovative and, in furthering the public good, one worthy of attempting. With some modification, the Court finds the proposal to be practicable.

Third, the Court must consider whether the proposed project bears an equitable relationship to the degree and kind of wrong which it is intended to remedy. Since portions of the wetland were, since 1977, adversely and illegally affected by the draining and filling operations, it is not inequitable to destroy the cornfields planted in those portions. Those who built their houses hard by the Great Cedar Swamp are in a somewhat different position as they did so in complete good faith, without any knowledge or appreciation of the possibility that Cumberland was illegally farming its own property. Still, the fact is that the Great Cedar Swamp came within the Corps' jurisdiction on July 1, 1977 and abutters who built their houses thereafter are thus in a position analogous to those who have built in violation of zoning laws of which they knew nothing. They bear the risk that the controlling law will be uniformly enforced, *see* e.g., *Cullen v. Building Inspector of North Attleborough*, 353 Mass. 671, 678–679, 234 N.E.2d 727 (1968) (structures offensive to zoning by-law ordered dismantled despite economic waste argument); *accord Carpenter v. Zoning Board of Appeals of Framingham*, 352 Mass. 54, 223 N.E.2d 679 (1967); *Bridgewater v. Chuckran*, 351 Mass. 20, 217 N.E.2d 726 (1966), and it is thus not inequitable to enforce the law here for the general public good even though such enforcement carries with it some attendant risks for these abutters. The owners of the cranberry bogs to the south are in still a different position. Like the newly abutting homeowners, they are completely without fault. Moreover, their cranberry farming antedated any government regulation in this area whatsoever. For the restoration under the Corps' auspices to adversely affect their interests would appear to violate the agricultural

exemption they enjoy under 33 U.S.C. § 1344(f)(1). Accordingly, the Court concludes that, as to them, the restoration proposed by the Corps is so sweeping as to be inequitable. Thus, no check dam shall be constructed closer than 1,000 feet from the boundary of any such cranberry bog. Pursuant to the same reasoning, since there were cornfields extant both east and west of Raven Brook prior to 1977, but one check dam shall be erected along that portion of Raven Brook bordered on both sides by these cornfields.

The mandatory restorative injunction which forms part of the final judgment herein is crafted in such a way as to restore the Great Cedar Swamp to its condition as of July 1, 1977, sensitive to the concerns just discussed.

### Penalty

■ Pursuant to the Clean Water Act, 33 U.S.C. § 1319, it is open to the United States to seek a civil penalty of up to $10,000 per day for each day of violation of that Act. A day of violation constitutes not only a day in which Cumberland was actually using a bulldozer or backhoe in the wetland area, but also every day Cumberland allowed illegal fill material to remain therein. *United States v. Tull*, 615 F.Supp. 610, 626 (1983), *aff'd* 764 F.2d 182 (4th Cir.1983). *See also Chesapeake Bay Foundation, Incorporated v. Gwaltney*, 791 F.2d 304, 24 ERC 1417–1427 (4th Cir. 1986).

Since 1972 Cumberland has followed an intentional policy of draining, ditching, filling the Great Cedar Swamp and turning it to productive agricultural use. That policy has been implemented at a rate consistent with Cumberland's economic needs in light of the equipment and manpower available to actually seed and plant the areas taken from the wetland.

When Cumberland first became aware that local, state, and national authorities questioned its right to continue its draining and filling operations, it did two things. First, it resorted to active and aggressive lawyering, the exercise of its legal rights to

determine its legal position. Throughout, insofar as this Court can see, the issues that Cumberland has placed before the state and federal courts have been, in the main, issues worthy of careful consideration and appropriate for full litigation, and no sanction will be visited upon it for this conduct. At the same time, it is clear that Cumberland, even after the initial requests and then orders that it stop, continued with its filling, ditching, and grading operations. It continued, more sporadically, somewhat surreptitiously, but it did intentionally continue to fill, drain, and ditch the premises on the theory that the regulatory authorities and the courts would not be likely to order destruction of fields already plowed and planted but would rather simply order an halt to further activities. For this conduct, too—at least insofar as it took place prior to December 28, 1984—Cumberland will not be punished, though the Court finds Cumberland's conduct and its insensitive approach to responsible environmental concerns reprehensible as a matter of corporate citizenship. The Corps' own opaque regulation, 33 CFR 330.3, so vitiates any claim of legal culpability on the part of Cumberland prior to December 28, 1984 that this Court, as matter of discretion, refrains from imposing any penalty for actions prior to that date.

The United States argues that there is no credible evidence that Cumberland actually relied on the Unasserted Jurisdiction Permit. This is so, but it is irrelevant. Insofar as the Clean Water Act provides for penal sanctions, it is to be strictly construed. *See United States v. Anzalone,* 766 F.2d 676, 680 (1st Cir.1985); *United States v. Medina,* 797 F.2d 1109, 1114 (1st Cir.1986). A "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322

(1926); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); *Winters v. New York,* 333 U.S. 507, 515–516, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948). This is no less true of a federal regulation. The Unasserted Jurisdiction Permit regulation, 333 CFR 330.3, fails this test since persons of common intelligence would not suspect that it applies solely to exempt certain conduct from the reach of the Rivers and Harbors Act, § 10, and has no applicability to the permit granting procedure under the Clean Water Act. To paraphrase a distinguished Massachusetts jurist, "The vice of [this regulation prior to the unequivocal assertion of Corps jurisdiction] lies in its failure to prescribe any standard capable of intelligent human evaluation to enable one chargeable with its violation to discover those conditions which convert conduct which is prima facie lawful into that which is [penalized]." *Commonwealth v. Carpenter,* 325 Mass. 519, 521, 91 N.E.2d 666 (1950) (Wilkins, J.). Indeed, the draftsmanship of the Unasserted Jurisdiction Permit, 33 CFR 330.3, is a reproach to the Corps. Without the most extensive and careful analysis of the background of the regulatory scheme, no reasonable person in Cumberland's position would conclude that he did not enjoy the protection of the Unasserted Jurisdiction Permit, at least until December 28, 1984.[11] In these circumstances no penalty ought be visited on Cumberland for its conduct prior to its receipt of the letter of December 28, 1984.

After December 28, 1984, or at least once the Corps' letter of that date was received by Cumberland on January 2, 1985, however, it could hardly misunderstand that the Corps was exercising jurisdiction over the Great Cedar Swamp and the national permit set out in 33 CFR 330.3 had no further arguable relevance. Cumberland refused to comply with the immediate remedial measures demanded, and sought the judgment of "some higher authority." Whatever it meant by that, to the extent

---

**11.** It will be remembered that, in seeking to have Cumberland's declaratory judgment action dismissed, the Corps itself represented to this Court on September 9, 1983 that it had *not* determined whether to exercise jurisdiction over the Great Cedar Swamp.

that Cumberland, in effect, said, "Sue, me," this Court will impose no punishment. That is what the courts are for.[12]

■ Whatever Cumberland's right to seek legal redress, however, Cumberland well knew it assumed the full risk of condign punishment for its further destruction of the Great Cedar Swamp. Nevertheless, even with this full knowledge, on or about March 10, 1985, and in the days preceding, Cumberland extended the area of soil disturbance further into the swamp by burning brush and by moving and grading and filling the top soil in defiance of the cease and desist order.[13]

Further, on April 3, 1985, Cumberland was operating a backhoe within the swamp area along the westerly border of the site and was removing material from a ditch it had earlier constructed, piling that material on wetland vegetation and destroying certain of that wetland vegetation.

Likewise, during the spring of 1985, in defiance of the cease and desist orders, Cumberland ran a ditch from the center of its property to the Bartlett Brook. This ditching, in addition to the destruction of wetland vegetation, caused further erosion of soil in that area.

In May, 1985, Cumberland took the next step of converting to productive farmland the land it had taken from the Swamp in March. Cumberland stored manure in that area prepatory to spreading it on the plowed topsoil.

During November and December, 1985, in defiance of the Corps' cease and desist orders, Cumberland extended a field it had earlier cleared near the southerly border of the site. In extending the border of that field, Cumberland piled fill material within an area of the swamp and, indeed, pushed stumps and top soil close by the edge of Raven Brook.

The work accomplished subsequent to the receipt on January 2, 1985, of the letter of December 28, 1984, consumed, at a minimum, 20 man days, all of which involved the use of heavy equipment on fragile wetland vegetation. Each of these incursions was made well knowing that, at least as of December 28, 1984, the United States asserted jurisdiction over the site, and what's more, had ordered that such disturbance of the wetland area cease. Each and every one of these incursions was made in intentional violation of the orders of the Corps. The penalty imposed in the final judgment entered herein is designed to punish Cumberland and deter others from similar misconduct within the nation's environmentally precious wetlands.

12. The United States seems to be arguing that the gravity of Cumberland's offense under the Clean Waters Act is deepened by its refusal to submit immediately to the Corps' demands that it flood certain of its fields and dam numerous drainage ditches that it had constructed at its own cost. To accept this argument would result in embracing a principle entirely foreign to our tri-partite democratic system of checks and balances and would punish Cumberland for resorting to the courts. It is one thing to punish for affirmative conduct knowingly undertaken in defiance of lawful cease and desist orders. This Court will bring the full weight of the law to bear to punish such misconduct. *See infra* at 46–47. It is quite another to punish someone for inaction when he chooses to resort to the courts to adjudicate his rights rather than perform some affirmative action required by his government, which action will destroy his property and cause him economic harm. In short, someone who refuses to jump through the government's hoop and instead says, 'take me to court,' should not, and in this Court will not, be punished for that conduct.

13. Cumberland advances the argument that the destruction of the natural site—the Court uses the word "destruction" advisedly—must have taken place the preceding autumn. That it preposterous. The photographic evidence, especially Exhibit 26, speaks for itself. The fresh vehicle tracks and debris are so obvious as to compel the conclusion that major soil disturbance was taking place in March, 1985 in defiance of the cease and desist order.